IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABD AL HADI OMAR MAHMOUD FARAJ,    )
                                                              )
                                                              )
                    Petitioner,                          )
                                                              )
          v.                                                 )          Civil Action No. 05-1490 (PLF)
                                                              )
GEORGE W. BUSH, *et al.,*                       )
                                                              )
                    Respondents.                       )
_____)

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

    1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

    2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abd al Hadi Omar Mahmoud Faraj that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel and foreign nationals in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _22 December 2005_                                      _Teresa A. McPalmer_
                                                                                    Teresa A. McPalmer
                                                                                    CDR, JAGC, U. S. Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: **6 2 4**

~~FOR OFFICIAL USE ONLY~~

**1 6 JAN 2005**

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 329**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #329 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

UNCLASSIFIED

12 Jan 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 329

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #12 of 29 September 2004
       (2) Record of Tribunal Proceedings

1.  Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal, I
find that:

    a.  The detainee was properly notified of the Tribunal process and elected to participate.

    b.  The Tribunal was properly convened and constituted by enclosure (1).

    c.  The Tribunal substantially complied with all provisions of references (a) and (b).
    Note that some information in exhibit R-3 was redacted.  The FBI properly certified in
    exhibit R-2 that the redacted information would not support a determination that the
    detainee is not an enemy combatant.

    d.  The detainee did not request that any witnesses or evidence be produced .

    e.  The Tribunal's decision that detainee #329 is properly classified as an enemy
    combatant was unanimous.

    f. The Personal Representative declined to submit post-tribunal comments to the Tribunal

2.  The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final

PETER C. BRADFORD
LT, JAGC, USNR

UNCLASSIFIED



### Department of Defense
#### Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

MEMBERS:

███████████████ Colonel, U.S. Marine Corps Reserve; President

███████████████ Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

███████████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

22 November 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander

SUBJECT:  CSRT Record of Proceedings ICO ISN# 329

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███████.

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:    #12

(U) ISN#:    329

Ref:  (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
      (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
      (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/FOUO)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 29 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 29 October 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #329 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with, al Qaida, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____

ISN #: _____329_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant and was part of or supporting al Qaida. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee traveled from Syria to Afghanistan via Iran in 2000 and stayed at a guesthouse located in Kabul, Afghanistan where the host made training available to people going to fight the coalition forces. The Detainee's name appears on a document recovered from a suspected al Qaida safehouse and a ▓▓▓▓▓▓▓▓▓▓▓▓▓ provided information that the Detainee joined an al Qaida training camp upon arrival in Afghanistan. The Detainee chose to participate in the Tribunal process. The Detainee, in his verbal statement, agreed that he traveled to Afghanistan, but only to find employment, and he stayed at a house catering to Syrians but never saw any weapons. He denies that it was his name discovered on the document recovered in the al Qaida safehouse and he denies training in any camps.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a, D-b*- and R-1 through R-10.

    b. Testimony of the following persons: Sworn statement of the Detainee

*Exhibit D-b is a submission of the Personal Representative's notes resulting from his interview of the Detainee.

UNCLASSIFIED//~~FOUO~~

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested no witnesses or any additional evidence be produced, therefore, no ruling on these matters were required.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony. A summarized transcript of the Detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee testified that he left Syria because he just wanted to find employment in Afghanistan as a butcher, a trade he learned and performed in Syria. He could not make enough money in Syria to buy a house and start a family. He could not find work as a butcher in Afghanistan but he worked for four months in a small store and quit. He was unemployed for at least four months. The owner of the house, who was a refugee himself, helped him with money and this permitted him to attend classes in Islam, something he did out of boredom. After the "fall of Afghanistan," Arabs were being killed, so he fled to Pakistan, where he was captured at the border. The Tribunal considered the Detainee's testimony as well as Exhibit D-b but found it not credible in pertinent part, as it was substantially contradicted by the weight of the other evidence submitted, as discussed in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

c. The Detainee is properly classified as an enemy combatant and was part of, or supporting, al Qaida, which is engaged in hostilities against the United States and its coalition partners.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

**Summarized Sworn Detainee Statement**

*The Detainee was sworn.*

*The Personal Representative made the following statement on behalf of the Detainee, and addressed each point on the Unclassified Summary.*

- **3(a)    The Detainee is associated with the Taliban and Al Qaeda.**

    This statement is not true.

- **3(a)1    Originally from Syria, the Detainee arrived in Afghanistan in 2000 after spending several months in Iran.**

    This is correct, but I entered Afghanistan alone, and no one came with me. I was trying to find work in Iran, but couldn't find any, so I went to Afghanistan. When I went to Afghanistan, I didn't know anything about fighting going on there. What kept me there was the lack of money to travel to Pakistan.

- **3(a)2    The Detainee stayed in a house reserved for Syrians, which was located in Kabul, Afghanistan.**

    This statement is true; there were seven Syrians that stayed there. The house belonged to another guy, who was also a refugee. He had no ties to the Taliban. The reason the owner came to Afghanistan was because it was an Islamic country.

- **3(a)3    The host of the house made training available to people going to fight coalition forces.**

    This statement is not true. When I was there, I never saw any weapons and no one carried one. The people from the Red Cross, who lived in the neighborhood around the house, knew that all of us were not fighters or Taliban, just refugees.

- **3(a)4    The Detainee's name or alias appears on a document recovered from safehouse raids on suspected Al Qaeda.**

    This statement is not true. My interrogator brought that paper to me and told me "this is your name," but it is not my name. The name on the paper is Abu Omar Mohammad. My name is Abu Omar Al-Hamawe. There is no one named Mohammad in my family.

ISN# 329
Enclosure (3)
Page 1 of 8

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

- **3(a)5    A foreign intelligence organization has provided information that indicates that the Detainee joined an Al Qaeda training camp upon arriving in Afghanistan.**

     This statement is not true.  The interrogator said that I had trained in Kandahar; I don't even know where that is.  I never went to any camp to train.

## Tribunal Members Questions to Detainee

Q:     You are originally from Syria.  Is that correct?

A:     Yes, that is true.

Q:     What were you doing in Syria before you left to go to Iran?

A:     I was a butcher.

Q:     Was that not sufficient to make a living in Syria?

A:     It was sufficient, but I'd never be able to make enough to get my own house and to get married.

Q:     So, what kind of work were you looking to find in Iran?

A:     The same line of work.

Q:     The Iranians would allow people from outside their country come look for work, when they have so many people trying to find work themselves?

A:     I worked in Iran for a short period of time.  It didn't work out very well for me, and I left.

Q:     Your intent was to go to Pakistan after that?

A:     My intention was to stay in Afghanistan for a little while and then go somewhere else, but the money issue didn't help me.  A friend of mine promised to send me money from outside Afghanistan to help me get out.

Q:     But he didn't?

A:     Because of the problems that happened, we just left.

Q:     Do you remember what time frame you entered Afghanistan?

A:     I don't remember exactly, but it was the end of 2000 or the beginning of 2001.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

Q:     Did you find work in Afghanistan when you first arrived there?

A:     Yes. I stayed in the house for approximately four months and then I found a job in the store. I worked in the store for about four months, but not for the money. It was just to get out. The money was very little. I worked there for fun and to interact.

Q:     If you didn't make enough money working in the store, how were you ever going to make enough to leave Afghanistan?

A:     As I told you, I was waiting for money to come in from the outside; I wasn't counting on the money from the store. I just worked there for entertainment and for interaction.

Q:     Were your decisions to go from Syria to Iran and then to Afghanistan based on religious reasons?

A:     No, it wasn't based on religion. My plan was to go to Iran, hopefully make enough money and then go to Saudi Arabia. When I was stuck in Iran, because I didn't have enough money, I couldn't go to Syria and I couldn't stay there, so that's why I went to Afghanistan.

Q:     Did you say part of your plan was to go to Iran and then Saudi Arabia?

A:     Yes, that's true. Going to Saudi Arabia is not easy. You need a lot of money; you have to get a visa and permits. That's why I was trying to get money in Iran.

Q:     So, while you were working in Afghanistan, you stayed at the house with the other Syrians?

A:     Yes.

Q:     What did they do for a living?

A:     The owner of the house was a refugee and he used to get money from his family. Most of the others were refugees as well and they just used to study.

Q:     So, they just relied on the generosity of the owner?

A:     They also used to receive help from their homes.

Q:     Did the government authorities ever approach you, or other people in the house, and ask you to do things for them?

UNCLASSIFIED//~~FOUO~~

A:    No.

Q:    When did you first realize that Afghanistan was in the middle of a civil war?

A:    When I went to Afghanistan, there was no civil war. I don't know if it was in another area of Afghanistan, but it wasn't in the place I was.

Q:    What caused you to leave Afghanistan?

A:    After the fall of Afghanistan, I had to leave because the Northern Alliance was killing Arabs and all of the Arabs were targets.

Q:    Even then, the Taliban didn't try to make you fight for them?

A:    I never heard the Taliban asking us to do anything for them, besides we had no connection whatsoever with the Taliban.

Q:    Please describe the circumstances of how you were captured.

A:    We had an Afghani guide take us from Afghanistan to Pakistan. We got close to the border and there were three or four thousand soldiers between the Afghanistan/Pakistan border. They asked me for my passport and my documents; I told them I didn't have them. After that they took us and I thought they were going to deliver us to our country's embassy, but instead they delivered us to the Americans.

Q:    Did any Syrian embassy representatives come to visit you?

A:    No, because we only stayed one day in Pakistan. Our capture was around noon, and by the time we were taken to another area, it was night. The next day, they took us to another prison where they delivered us to the Americans. The whole thing was just one day.

Q:    Why didn't you have your passport and documents with you when you left Afghanistan?

A:    My documents were in the house. I was sick that day, so I went to get some medical attention. On my way back, I met a Palestinian and he asked me where I was going. I told him, and he said the Northern guys were already there, so I left with him in the car.

      I didn't have a chance to go back to the house and get my passport, plus I wasn't really thinking of that, I was just thinking of getting out.

UNCLASSIFIED//~~FOUO~~

Q:    You didn't have anything with you when you left? No money? No weapons?
      Just what you were carrying?

A:    I had a little money, that's all.

Q:    Have you ever seen your passport again?

A:    No.

Q:    Have you ever had any military training at all, in your life?

A:    · No, never. In my life, I've never carried a weapon. Not in Syria, Iran or in·
      Afghanistan.

Q:    In the house with the other Syrians, you said your neighbors were Red Cross.
      What Red Cross organization is that?

A:    I said that all the houses had families and kids; all refugees. The Red Cross was
      around because Red Cross helps people.

Q:    The International Red Cross, or an Islamic version of the Red Cross?

A:    I don't know. I think it was the International because I don't know the difference.
      I just saw the Red Cross on the cars and the houses. I assume it was the
      International.

Q:    You said you were expecting money from Syria. Who was going to send you that
      money?

A:    No, the money wasn't going to come from Syria; it was going to come from Saudi
      Arabia. I used to have a friend that would visit us and he went to Saudi Arabia
      and promised he's send money from there.

Q:    So, it was a friend?

A:    He was a friend who used to come play dominos.

Q:    Do you remember his name?

A:    I really don't remember his name, but I had his address and phone number in my
      wallet when I was in Afghanistan.

Q:    What city did he live in?

UNCLASSIFIED//~~FOUO~~

A:    It's all in the paper. I really don't remember. I don't really know the areas of Saudi Arabia, I just hear about it from the guys here that someone is from Riyadh, that's all.

Q:    Are you very religious?

A:    I'm just a normal Muslim. I'm not an extremist; I just pray and fast.

Q:    Were you aware of any of the fatwas that were looking for people to come to Afghanistan?

A:    I didn't hear of any fatwas. I just went there because everyone there is Muslim.

Q:    Where in Afghanistan were you located?

A:    I was in a village in Kabul. The house was close to the Pakistan embassy in Kabul.

Q:    That wasn't very far from Jalalabad and Pakistan? Pretty close to where you wanted to go?

A:    The only time I went to Jalalabad was when Kabul fell into the Northern Alliance hands. It's about a six-hour drive from there to Pakistan.

Q:    When you were working as a butcher in Afghanistan, whom did you work for?

A:    I wasn't working in a butcher shop in Afghanistan; it was just a convenience store.

Q:    What was the owner's name?

A:    He was an Algerian guy, but the guy that worked in the store was a Pakistani named ███████ This Pakistani guy used to know the dialects of Pashtu, Dari and all those languages.

### Tribunal President's Questions to Detainee

Q:    What was the total number of months you stayed in Afghanistan?

A:    It was less than a year, maybe 10 or 11 months, but definitely less than a year.

Q:    How long did you work in the convenience store?

A:    Approximately four months.

UNCLASSIFIED//~~FOUO~~

Q:    What other types of employment did you have in Afghanistan?

A:    I didn't have any other job.  I just attended classes on Islam and the Koran about religion and all things related to prayer.  I just wanted to learn and I wanted some entertainment because I was bored sitting in the house all day.

Q:    The house you stayed in, did you have to pay rent or buy your own food?

A:    Yes, we used to all participate and give something.  Some of us received help from home, but mostly the owner of the house used to get a lot of help from his home in Syria.

Q:    Who was the owner of the house?

A:    His name is █████████

Q:    You indicated he was a refugee as well?

A:    Yes, he was a refugee in an Islamic country.  He was an immigrant to an Islamic country.

Q:    What was the total number of people that lived in this house?

A:    Seven.

Q:    When you were captured by the Northern Alliance, how many people were with you?

A:    I wasn't captured by the Northern Alliance; I was captured by the Pakistanis.

Q:    Oh, how did you get into Pakistan?

A:    He just asked me a few minutes ago.  We went to the village at the border between Afghanistan and Pakistan and that's how we got captured.

Q:    Please tell me again, how many were with you when you were captured by the Pakistani authorities?

A:    Four of us.

Q:    Were they also Arabs?

A:    Yes, Syrian Arabs and they are all here.

Q:    You knew them all?

UNCLASSIFIED//~~FOUO~~

A:     Yes, and they are all here.

Q:     Were these the same individuals that stayed in the house with you?

A:     Yes.

Detainee:  You mentioned that a foreign country said that I went to…who is this foreign country and where did they get this information?

Tribunal President:  We don't know that either, at this point.

Detainee:  How?

Tribunal President:  It may be identified to us when we look at the classified evidence.

Detainee:  Okay, good.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

## DETAINEE ELECTION FORM

|  |  |
|---|---|
| Date: | 23 OCT 04 |
| Start Time: | 0830 |
| End Time: | 0945 |

ISN#: _____ 329 _____

Personal Representative: ██████████████LTC _____
(Name/Rank)

Translator Required? __Y__          Language? _____ ARABIC _____

CSRT Procedure Read to Detainee or Written Copy Read by Detainee? ___YES___

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Detainee Election:**

[X]   **Wants to Participate in Tribunal**

[ ]   **Affirmatively Declines to Participate in Tribunal**

[ ]   **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee will attend, will take an oath. Has no witnesses and no documents to provide. He will
have the PR read his statements regarding the allegations. The detainee will answer questions
from the Tribunal.

Personal Representative: ██████████████████████

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (06 October 04)

Subject: Summary of Evidence for Combatant Status Review Tribunal – FARAJ, Abd Al Hadi Omar Mahmoud.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with the Taliban and al Qaida.

The detainee is associated with the Taliban and al Qaida:

1. Originally from Syria, the detainee arrived in Afghanistan in 2000 after spending several months in Iran.

2. The detainee stayed in a house reserved for Syrians, which was located in Kabul, Afghanistan.

3. The host of the house made training available to people going to fight coalition forces

4. The detainee's name or alias appears on a document recovered from safehouse raids on suspected al Qaida.

5. A foreign intelligence organization has provided information that indicates that the detainee joined an al Qaida training camp upon arriving in Afghanistan.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

Exhibit **R-1**

Pg 19/1

UNCLASSIFIED

# Memorandum

To : Department of Defense
Office of Administrative Review
for Detained Enemy Combatants
Col. David Taylor, OIC, CSRT

Date 10/01/2004

From : FBI GTMO
Counterterrorism Division
Asst. Gen. [redacted]

Subject REQUEST FOR REDACTION OF
NATIONAL SECURITY INFORMATION
[redacted]

Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following documents relative to ISN 329 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 07/01/2003

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

UNCLASSIFIED

1/2

Exhibit R-2

UNCLASSIFIED

Memorandum from ▮▮▮▮▮▮ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/01/2004


          If you need additional assistance, please contact Asst.
Gen. Counsel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, or Intelligence Analyst ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Intelligence Analyst ▮▮▮▮▮▮

UNCLASSIFIED//~~FOUO~~

Detainee Statement #329

3. a.  This statement is not true.

    1.  This is correct, but I entered Afghanistan alone, no one came with me.  I was trying to find work in Iran, but couldn't find any, so I went to Afghanistan.  When I went to Afghanistan, I didn't know anything about fighting going on there.  What kept me there was the lack of money to travel to Pakistan.

    2.  This statement is true; there were seven Syrians that stayed there.  The house belonged to another guy who was a refugee also.  He had no ties to the Taliban.  The reason the owner came to Afghanistan was because it was an Islamic country.

    3.  This statement is not true.  When I was there, I never saw any weapons and no one carried one.  The people from the Red Cross who lived in the neighborhood around the house knew that all of us were not fighters, Taliban, just refugees.

    4.  This statement is not true.  My interrogator brought that paper to me and told me "this is your name".  But it is not my name.  The name on the paper is Abu Omar Mohammad.  My name is Abu Omar Al-Hamawe.  There is no one named Mohammad in my family.

    5.  This statement is not true.  The interrogator said that I had trained at Kandahar, I don't even know where that is.  I never went to any camp to train.

UNCLASSIFIED//~~FOUO~~

Exhibit D-b

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on __*19*__ November 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #329.

        ✔ I have no comments.

        ___ My comments are attached.



_____ *LTC*         *19 Nov 04*
Name                         Date

Signature

ISN #329
Enclosure (5)

UNCLASSIFIED//~~FOUO~~