**EXHIBIT E**

AIDS Relief Report Released Today | Daily Press Briefing |

# Syria

Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Syria is a republic under an authoritarian regime with virtually absolute authority in the hands of the President. The President, with counsel from his ministers, senior members of the ruling Ba'th Party, and a small circle of security advisers, makes key decisions regarding foreign policy, national security, internal politics, and the economy. President Bashar al-Asad was confirmed by an unopposed referendum in July 2000 for a 7-year term. The President appoints vice presidents, the prime minister, deputy prime ministers, and the cabinet, or Council of Ministers. Ba'th Party leaders, whose primacy in state institutions and the Parliament is mandated by the Constitution, influence all three branches of the Government. The Parliament, elected in March 2003, may not initiate laws but only assess and, at times, modify those proposed by the executive branch. The Constitution provides for an independent judiciary; however, security courts were regularly subject to political influence. Political connections and bribery sometimes influenced verdicts in regular courts.

The powerful role of the security services, which extends beyond strictly security matters, is due to the state of emergency, which has been in place since 1963. The Government justifies ongoing martial law because of its state of war with Israel and past threats from terrorist groups. Syrian Military Intelligence and Air Force Intelligence are military agencies; the Ministry of Interior controls general security, state security, and political security. The branches of the security services operated independently of each other and outside the legal system. The Government maintained effective control of the security forces, and members of the security forces committed numerous, serious human rights abuses.

The country has a population of approximately 18 million and an economy based on commerce, agriculture, oil production, and services. A variety of factors hampered economic growth, including the dominant state role in the economy, a complex bureaucracy, security concerns, corruption, currency restrictions, a lack of modern financial services and communications, and a weak, corrupt legal system. Economic growth was estimated at less than 2.5 percent in the last year.

The Government's human rights record remained poor, and the Government continued to commit numerous, serious abuses. Citizens did not have the right to change their government. The Government prevented any organized political opposition, and there have been few antigovernment manifestations. Continuing serious abuses included the use of torture in detention, which at times resulted in death; poor prison conditions; arbitrary arrest and detention; prolonged detention without trial; fundamentally unfair trials in the security courts; and infringement on privacy rights. The Government significantly restricted freedom of speech and of the press. The Government also severely restricted freedom of assembly and association. The Government did not officially allow independent domestic human rights groups to exist. The Government placed some limits on freedom of religion and freedom of movement. Violence and societal discrimination against women were problems. The Government's discrimination against the stateless Kurdish minority resulted in a series of riots in March centered in the Hassakeh province which spread to other parts of the country during which more than 30 persons were reportedly killed by security forces and more than 1000 arrested. The Government also restricted worker rights.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

According to Amnesty International (AI) and the Human Rights Association of Syria (HRAS), there were eight persons who died in detention due to torture or mistreatment by the security services during the year. Most of the cases involved Kurdish citizens detained and tortured in the wake of the riots in the Hassakeh province in March. In one case, Firas

Case 1:05-cv-01490-UNA    Document 27-6    Filed 07/11/2006    Page 3 of 5

Syria                                                                                         Page 2 of 17

Abdallah, the household employee of a famous singer, died while in police custody in Damascus as a result of beatings. Human rights lawyers tried to bring a case against the police on behalf of the deceased, but the state prosecutor refused to accept it.

In March, security forces opened fire with live ammunition on Kurdish citizens during civil disturbances and demonstrations, killing 30 civilians in Hassakeh province on March 12 and between 5 to 8 Kurdish demonstrators in Aleppo on March 16 (see Section 5).

On April 8, media sources reported that Hussein Hamak Nasso, a 26-year-old Kurd, died after being tortured by security forces in the town of Afreen. Security forces reportedly then forced Nasso's family to secretly bury him in their presence.

On October 30, an off-duty Sunni military officer and his brother killed two Assyrian Christians in Hassakeh province. The conflict began when the military officer tried to extort money from one of the Assyrians. Some members of the Assyrian community violently protested the murders. In response, the government arrested 12 Assyrians. No charges were brought against the officer or his brother.

b. Disappearance

There were no confirmed reports of politically motivated disappearances; however, HRAS continued to report numerous cases of disappearance that occurred up to 20 years ago. Mohammed Fahed Al-Shaar was detained at Damascus airport in 1982; since then, the Government has not provided any information on his case. The Government frequently detained political prisoners and held them in long-term detention without informing the families of their situation (see Section 1.e.). For example, the family of a recently released prisoner had no knowledge about his well-being while he was in custody. Many persons who disappeared in the past were believed to have died or to be in long-term detention.

The Government has yet to punish any members of the security forces for their roles in these abductions and disappearances.

The Government continued to withhold new information on the welfare and whereabouts of persons who have been held incommunicado for years or about whom little is known other than the approximate date of their detention. Despite the Government's claim that it has released all Palestinians, Jordans, and Lebanese citizens reportedly abducted from Lebanon during and after its civil war, various nongovernmental organizations (NGOs) and family members of those who allegedly remain in prison continued to dispute the Government's claim (see Section 1.d.).

c. Torture and Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits such practices, and the Penal Code provides punishment for abusers. Under Article 28 of the Constitution, "no one may be tortured physically or mentally or treated in a humiliating manner." However, there was credible evidence that security forces continued to use torture frequently.

There were reports of death in prison due to torture (see Section 1.a.).

During the year, HRAS reported numerous cases of security forces using torture on prisoners in custody, including the case of five Kurdish students detained by the police in April and reportedly beaten and subjected to electric shocks for 3 days (see Section 5). The torture of political detainees was a common occurrence. AI reported the case of four young men arrested in April of 2003 in Daraa and held in Saidnaya prison where they were subjected to various forms of torture and ill-treatment, including having their fingers crushed; receiving beatings to their face and legs; having cold water thrown on them; being forced to stand for long periods of time during the night; hearing loud screams and beatings of other detainees; being stripped naked in front of others; and being prevented from praying and growing a beard.

Former prisoners and detainees, as well as the HRAS, reported that torture methods included administering electrical shocks; pulling out fingernails; forcing objects into the rectum; beating, sometimes while the victim was suspended from the ceiling; hyperextending the spine; bending the detainees into the frame of a wheel and whipping exposed body parts; and using a backward-bending chair to asphyxiate the victim or fracture the victim's spine. Torture was most likely to occur while detainees were being held at one of the many detention centers run by the various security services throughout the country, particularly while the authorities were attempting to extract a confession or information. For example, in July, a Syrian-Canadian citizen reportedly was tortured while being questioned by security services (see Section 1.e).

Past victims of torture have identified the officials who tortured them, up to the level of brigadier general. If allegations of excessive force or physical abuse were to be made in court, the plaintiff was required to initiate his own civil suit against the alleged abuser. However, no action was taken against the accused. There were no examples of such allegations

during the year. Courts did not order medical examinations for defendants who claimed that they were tortured (see Section 1.e.).

August 19 marked the Government's accession to the U.N. Convention against Torture, but the Government's reservation to Article 20 prevents outside observers from investigating torture within the country.

Prison conditions generally were poor and did not meet international standards for health and sanitation. At some prisons, security officials demanded bribes from family members. Overcrowding and the denial of food remained problems at several prisons. According to the Arab Organization for Human Rights (AOHR), Abdul Karim Dhaon, an official at the Ministry of Health, was arrested in May for allegedly writing a report about the unacceptable conditions at the prisons that he supervised. According to Human Rights Watch (HRW), prisoners and detainees were held without adequate medical care, and some prisoners with significant health problems reportedly were denied medical treatment. Some former detainees reported that the Government prohibited political prisoners from having access to reading materials, including the Koran.

There were separate detention facilities for men, women, and children. But there were at least three reported cases where minors were arrested and held in adult prisons. Pretrial detainees, particularly those held for political or security reasons, were usually held separately from convicted prisoners. Facilities for political or national security prisoners generally were worse than those for common criminals. Released political detainees have reported inadequate prison conditions, including overcrowded cells and a shortage of beds.

The Government did not permit independent monitoring of prison or detention center conditions; however, diplomatic or consular officials were granted access in some cases. The International Committee of the Red Cross (ICRC) is not allowed to make prison visits to assess the situation of the prisons or prisoners.

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest and detention; however, in practice, these activities persisted and remained significant problems.

The Ministry of Interior controlled the police forces, which consist of four separate divisions: emergency police; local neighborhood police; riot police; and traffic police. The emergency division responds to 911 calls and operates through roving patrols. The local neighborhood police are responsible for general security in the neighborhood they patrol and respond to non-emergency situations. The Government uses the riot police to break up demonstrations and marches.

There are four major branches of security: Political Security Directorate (PSD); Syrian Military Intelligence (SMI); General Intelligence Directorate (GID); and Air Force Security (AFS), all of which devote some of their overlapping resources to monitoring internal dissent and individual citizens. Only PSD, supervised by the Ministry of Interior, is under civilian control. The four branches operate independently and generally outside of the control of the legal system.

Corruption continued to be a serious problem throughout the police forces and security services. International and regional human rights groups continue to consider the police forces corrupt.

The arrest procedure for non-emergency cases is similar to the process in Western countries. After being arrested, an individual is brought to the police station for processing and detained until a trial date is set. At this time, the accused may retain an attorney at personal expense or that of the Government. The individual will then be tried in a civil court, where a judge will render a verdict (see Section 1.e.).

The 1963 Emergency Law authorizes the Government to conduct preventive arrests and overrides Constitutional and Penal Code provisions against arbitrary arrest and detention, including the need to obtain warrants. In cases involving political or national security offenses, arrests were often carried out in secret. Suspects could be detained incommunicado for prolonged periods without charge or trial and denied the right to a judicial determination regarding pretrial detention. Additionally, those suspected of political or national security offenses could be arrested and prosecuted under ambiguous and broad articles of the Penal Code and subsequently tried in either the criminal or security courts. There were reliable reports that the Government did not notify foreign governments when their citizens were arrested or detained or did so only after the prisoner was released.

Warrants only exist for non-security cases; however, police bypass this requirement in many instances by claiming security or emergency grounds for entry.

During the year, the security forces again conducted mass arrests of suspected Islamists: 25 in Hama; 18 in Hayaleen; 19

- remained detained since his arrest in July 2002 during his first visit to Syria. He faced trial before the SSSC, charged with belonging to the Muslim Brotherhood. In 1998 his brothers Yusef and 'Ubada, then aged 15 and 18, were arrested shortly after entering Syria, and sentenced by FMCs for alleged membership of a secret organization. They were released in 2000 and January 2004. All three brothers were reportedly tortured, including by the *dulab* ("the tyre", whereby the victim is forced into a tyre, which is suspended, and beaten with sticks and cables) and *al-kursi al-almani* ("the German chair", whereby the victim is put into a chair with moving parts which bend the spine backwards).
- Information came to light in October that dual Syrian-Canadian national Arwad Muhammad 'Izzat al-Boushi had received a grossly unfair trial before an FMC in July 2003 after which he was apparently sentenced to 12 years' imprisonment for alleged membership of the Muslim Brotherhood. He was reportedly tortured during the 12 months he was detained awaiting trial. He had left Syria in 1980 and was arrested on 3 July 2002 when he returned to visit his ailing father.
- Syrian-born German national Muhammad Haydar Zammar remained held in prolonged incommunicado detention in solitary confinement at the Palestine Branch (*Far' Falastin*) of Military Intelligence in Damascus since his arrest in November 2001. He was said to be held in appalling conditions in a tiny underground cell. US security forces were reportedly involved in his detention and interrogation in Morocco, where he was initially arrested, and in his secret transfer to Syria. His arrest was reportedly related to his alleged links to al-Qa'ida but he was not charged.

**Death penalty**

On 5 July the authorities announced that 16 people had been executed in 2002, and 11 in 2003. On 29 August the SSSC sentenced Mahmud al-Nabahan to death for being affiliated to the Muslim Brotherhood, and then commuted the sentence to 12 years in prison. According to Law 49 of July 1980, membership of or affiliation to the Muslim Brotherhood is punishable by death.

On 17 October it was reported that two people were executed in Aleppo, but no further details were made public. On 30 December, two men were sentenced to death by the SSSC, after being convicted of involvement in a bomb attack and gunfight in Damascus in April.

**AI visits**

Amnesty International repeated requests during the year to visit Syria for research and talks with government officials but received no response from the authorities

Previous - Home

# Amnesty International

© AMNESTY INTERNATIONAL