*CLEARED FOR PUBLIC FILING BY THE CSO*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ABDUL HADI OMER MAHMOUD FARAJ,**

  *Petitioner,*

  **v.**

               **Case No. 1:05CV01490 (PLF)**

**GEORGE W. BUSH,** *et al.,*

  *Respondents.*

---

## PETITIONER'S MOTION FOR RETURN OF LEGAL PAPERS

  Petitioner respectfully moves this Court for an order requiring Respondents immediately to deliver to counsel or return to Petitioner any and all legal papers which they may have seized and to destroy all copies, summaries, descriptions, or analyses of such papers. The grounds for this motion are set forth more fully in the accompanying memorandum. Since the motion is in direct opposition to Respondents' motion for procedures related to review of certain detainee materials, there has been no consultation among counsel pursuant to Local Rule 7.1(m).

        Respectfully submitted,

        GARVEY SCHUBERT BARER

        By /s/ Robert C. Weaver, Jr.
          Robert C. Weaver, Jr. OSB #80135
          Samuel C. Kauffman, OSB #94352
          GARVEY SCHUBERT BARER
          Eleventh Floor
          121 SW Morrison St.
          Portland, OR 97204
          Tel: (503) 228-3939
          Fax: (503) 226-0259

By /s/ Eldon V.C. Greenberg_____
    Eldon V.C. Greenberg
    D.C. Bar #159558
    GARVEY SCHUBERT BARER
    Fifth Floor
    1000 Potomac Street, N.W.
    Washington, DC 20007
    Tel: (202) 965-7880
    Fax: (202) 965-1729

    Attorneys for Petitioners

Dated: July 21, 2006

*CLEARED FOR PUBLIC FILING BY THE CSO*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ABDUL HADI OMER MAHMOUD FARAJ,** | |
| *Petitioner,* | |
| **v.** | **Case No. 1:05CV01490 (PLF)** |
| **GEORGE W. BUSH,** *et al.,* | |
| *Respondents.* | |

**PETITIONER'S MEMORANDUM IN OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS AND IN SUPPORT OF HIS MOTION FOR RETURN OF LEGAL PAPERS**

GARVEY SCHUBERT BARER

Robert C. Weaver, Jr. OSB #80135
Samuel C. Kauffman, OSB #94352
Eleventh Floor
121 SW Morrison St.
Portland, OR 97204
Tel: (503) 228-3939
Fax: (503) 226-0259

Eldon V.C. Greenberg
D.C. Bar #159558
Fifth Floor
1000 Potomac Street, N.W.
Washington, DC 20007
Tel: (202) 965-7880
Fax: (202) 965-1729

Attorneys for Petitioner

Dated: July 21, 2006

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

I.  THE PREMISE OF THE GOVERNMENT'S INVESTIGATION IS INVALID. .......... 2

II.  THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONER'S
    LEGAL PAPERS WAS UNLAWFUL. ............................................................... 8

    A.  Petitioner's Legal Papers May Not Be Seized and Reviewed Without
        An Individualized Showing of Probable Cause. ............................................. 8

    B.  The Government Has Made No Required Individualized Showing. ........... 12

III.  ANY FURTHER REVIEW OF PETITIONER'S LEGAL PAPERS SHOULD BE
    BY THE COURT OR A SPECIAL MASTER. ........................................... 16

CONCLUSION ....................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) .................................................. *passim*

*Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997) ............................................................ 16

*Carter v. Hutto*, 781 F.2d 1028 (4th Cir. 1986) ......................................................................... 10

*Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) ........................ 11

*Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997) ................................................................................... 10

*Hiney v. Wilson*, 520 F.2d 589 (2d Cir. 1975) ............................................................................ 10

*In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275,
     slip op. at 6 (6th Cir. July 13, 2006) .............................................................................. 16, 18

*In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) ..................................... 11

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) ..................................................................... 11

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997) ....................................................................... 11

*In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565,
     at *5 (M.D. Pa. June 22, 2006) ........................................................................................... 16

*In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994) ..................................... 17

*Lanza v. State of New York*, 370 U.S. 139  (1962) ....................................................................... 9

*Procunier v. Martinez*, 416 U.S. 396 (1974) ............................................................................... 9

*Rasul v. Bush,*, 542 U.S. 466 (2004) .......................................................................................... 17

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) .............................................................. 9

*United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995) ....................................................... 16

*United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2
     (S.D.N.Y. May 25, 2004) ..................................................................................................... 12

*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997) ............................................................. 17

*United States v. Skeddle*, 989 F. Supp. 890 (N.D. Ohio 1997) .................................................... 12

*United States v. Stewart*, No. CR 396 JGK, 2002 WL 1300059
     (S.D.N.Y. June 11, 2002) ........................................................................................ 11, 16, 17

*United States* v. *Zolin*, 491 U.S. 554 (1989) ............................................................................... 12

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ....................................................................... 9

*Wright v. Newsome*, 795 F.2d 964 (11th Cir. 1986) .................................................................... 10

## Regulations

DoD Regulation 5200.1: C5.2.7.1.1.3 ......................................................................................... 13

## Other Authorities

AMA, *New AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006 .................................................................................................................. 6

APA, *APA Statement on Psychiatric Practices at Guantanamo Bay*, June 27, 2005.................... 6

Catherine Philip, *US Dismisses Suicides as "PR Stunt,"* London Times, June 12, 2006 ............. 2

Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005............................................................................................................................... 17

Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations at A1-A3 (2003)* ..................................................................................................................... 5

Editorial, *How Complicit are Doctors in Abuses of Detainees?*, The Lancet, Aug. 21, 2004 ....... 6

*Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006............................. 2

Jane Mayer, *The Experiment*, New Yorker, July 11 & 18, 2005 .................................................... 6

Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006.......................................................................................................... 8

M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med., Jan. 6, 2005, at 3 .................................................................................................................... 6

Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006 .......... 2

Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005) ............................................................................................................. 5

Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006 ........................................ 2

Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006 ............. 2

Transcript, *Inside Guantanamo*, Fox News Network, June 12, 2006, at 3 .................................... 2

U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo Bay*, June 10, 2006 ..................................................................................................................... 2

## INTRODUCTION

Respondents' motion "for procedures related to review of certain detainee materials," filed July 7, 2006, should be denied, and Petitioner's motion for return of legal papers should be granted. The materials in question are privileged attorney-client communications. As a matter of fundamental principle, and by specific order of this Court, those communications were supposed to be secure against seizure and review by the government. The government's seizure and review of those communications, without prior notice to and approval by the Court, and without notice to counsel, was illegal. The government's failure to disclose its actions to the Court and counsel, until nearly a month after the fact, is without justification. In the name of investigating three prisoner deaths, the government has trampled upon a fundamental privilege and severely undermined the confidence the prisoners might still have had that their communications with their counsel would be confidential.

In the circumstances, the Court should deny Respondents' motion and should instead order the government to deliver the Petitioner's legal papers to counsel or return them to Petitioner immediately and destroy all copies, summaries, descriptions, or analyses of such papers. No further review of Petitioner's legal papers should be allowed without particularized justification. Any such further review should be conducted in the first instance by the Court or a special master without the involvement of the military or the Department of Justice.

**ARGUMENT**

**I.    THE PREMISE OF THE GOVERNMENT'S INVESTIGATION IS INVALID.**

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells with wads of cloth in their mouths.[1]  The military reported the prisoners' deaths as suicides.[2]

In his news conference, Navy Rear Adm. Harry B. Harris, the Commander of Joint Task Force–Guantánamo, denounced the deaths as acts of war:  "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists. They are dangerous men and they will do anything they can to advance their cause."[3]  Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths a "good PR move."[4]

---

[1]    Colonel Mike Bumgarner, the commander of the prison, stated in an interview that each of the prisoners was found with "a large wad of cloth in his mouth;" Colonel Bumgarner stated that he "did not know if the material was for choking or to muffle their voices while they took their lives." Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/14797522.htm.

[2]    U.S. Southern Command News Release, *Three Detainee Deaths at Guantanamo Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM%20 PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc; *Gen. John Craddock's Opening Statement*, Press Conference, June 10, 2006, *available at* http://www. southcom.mil/pa/News/June%202006/News060610-001.htm; Sara Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, June 10, 2006, *available at* http://www.defenselink.mil/ news/Jun2006/20060610_5379.html.

[3]    Wood, *supra* note 2. Admiral Harris has stated:  "Asymmetrical warfare is the idea that in a war between two entities, the lesser entity will use completely unorthodox and perhaps illegal means to try to gain an upper hand or the upper hand." Transcript, *Inside Guantanamo*, Fox News Network, June 12, 2006, at 3, available on Lexis-Nexis.

[4]    Catherine Philip, *US Dismisses Suicides as "PR Stunt,"* London Times, June 12, 2006, *available at* http://www.timesonline.co.uk/article/0,,11069-2221381,00.html; *see also* Reuters, *Three Guantanamo Detainees Die, US Army*, June 11, 2006, *available at* http://www.cageprisoners.com/articles.php?id=14371.

According to the declarations of Admiral Harris and Special Agent Carol Kisthardt in support of the government's motion, the Naval Criminal Investigative Service ("NCIS") initiated an investigation to determine "the manner and cause of death" of the three prisoners.[5]  Autopsies were to be performed, but, to counsels' knowledge, results have not been made public.

Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized and examined over a half-ton of written communications between Guantánamo prisoners and their lawyers.[6]  The government's seizure and examination of these materials violated the Protective Order entered by this Court to ensure the protection of that privilege.

The government claims that it seized the prisoners' legal papers because notes found in the cells of the dead prisoners suggested that the prisoners might have used the cloak of the attorney-client privilege in furtherance of a suicide "plot" by the prisoners, perhaps "encouraged, ordered, or assisted by third parties."[7]  There is no way to know whether the notes suggested such use of privileged communications or, if so, whether that was the actual reason for the government's subsequent actions.

Having belatedly disclosed its illegal seizure and examination, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely. The government sought judicial sanction for its actions only after *habeas* counsel, informed

---

[5]       Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

[6]       Kisthardt Decl. ¶¶ 2-5.

[7]       Harris Decl. ¶ 4.

of the government's actions by their clients, began to seek relief from the Court.[8]

The fact that Petitioner's legal papers were seized over a five-day period proves that no exigency required the government to act without seeking the approval of the Court and notifying counsel. At the very least, a conference call with counsel and the Emergency Judge on June 10, the day of the prisoner deaths, could have been arranged. *See* LCvR 40.1(c), 65.1, 57.8. The Justice Department either approved the military's seizure of the privileged materials without notice to or approval by the Court, or failed to prevent it. In either case, its action was unjustifiable.

Further, the Court should not allow the government to examine the seized materials on the premise that the three prisoners' deaths were acts of "warfare" or "a good PR move," or that other prisoners may be "plotting" to take their own lives. The hideous situation the prisoners have endured would be enough to account for any suicidal acts: these men have been imprisoned for more than four years, on an island thousands of miles from home, separated from family and friends and everything they know; interrogated endlessly and tormented by jailers who do not speak their language and view them as dangerous and depraved; imprisoned without charges and denied the evidence that purportedly explains their imprisonment; subjected to medical neglect; and given little hope that there will ever be an end to their ordeal.

The government's attempt to portray prisoner deaths as acts of "warfare" is an attempt to obscure that fact and avoid the government's overarching responsibility for the prisoners' conditions. The government's dark claims of suicide "plots" among the prisoners, possibly implicating "third parties," are merely a pretext for seizing and examining privileged

---

[8]    Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023 (RWR) (filed July 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. Resps.' Mot. at 1 n.1.

communications. As discussed below, the government before now had consistently sought to minimize hunger strikes and suicide attempts.[9]  Its history of indifference contrasts with its current contention that the search for further "plots" justifies ransacking the prisoners' legal papers.

In addition to the misery and hopelessness of their situation, at least some prisoners may attempt to take their own lives at Guantánamo because of the toll on their mental heath exacted by the government's efforts to "break" them. Breaking the prisoners' spirits and psyches for the purpose of collecting intelligence is Guantánamo's *raison d'être*: as Physicians for Human Rights has stated, "psychological torture [is] central to the interrogation process and reinforced through conditions of confinement."[10]

Prisoners have been subjected to a wide variety of cruel, inhuman, and degrading treatment, including prolonged exposure to extreme heat and cold, religious humiliations (including abuse of the Quran and interference with prayers), threats of execution, threats against family, and prolonged solitary confinement. The classified 50-day interrogation logs of one "high value" prisoner, published last year by *Time*, disclose torments from which no human

---

[9]     *See* Mark Denbeaux, *Report: The Guantánamo Detainees During Detention* (July 10, 2006), at 17-18 (Ex. A hereto).

[10]     Physicians for Human Rights, *Break Them Down: Systematic Use of Psychological Torture by US Forces* 1 (2005). Approved interrogation techniques have included "Removal from social support at Camp Delta"; "Segregation in Navy Brig"; "Isolation in Camp X-Ray"; "Deprivation of light"; "Inducing stress [through] use of female interrogator"; "Up to 20-hour interrogations"; "Removal of all comfort items, including religious items." Dep't of Defense, *GTMO Interrogation Techniques* (June 22, 2004). Evidence indicates that the government has also used even more brutal techniques, labeled "Fear Up Harsh," "Sleep Adjustment," and "Futility."  Dep't of Defense, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy, and Operation Considerations* at A1-A3 (2003), *available at* http://www.ccr-ny.org/v2/reports/docs/PentagonReportMarch.pdf.

could be expected to emerge mentally intact.[11]  In many instances, government doctors "assisted in the design of interrogation strategies, including sleep deprivation and other coercive methods tailored to prisoners' medical conditions. Medical personnel also coached interrogators on questioning technique."[12]

Predictably, these tactics have caused the mental health of many Guantánamo prisoners to deteriorate. According to government data, prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[13]  In August 2003 alone, 23 men attempted to hang themselves.[14]  The government chose to describe all but two of these hangings as incidents of

---

[11]    According to the interrogation logs, authorities held this prisoner in solitary confinement until he became delusional; subjected him to weeks of interrogations lasting 18-20 hours a day; made him bark, growl, and perform dog tricks; forced him to wear a woman's bra and placed a thong on his head; menaced him with dogs; hydrated intravenously and then denied access to a toilet; and, even after his heartbeat had slowed to 35 beats per minute and he was placed in a doctor's care, played screaming loud music in his cell to "prevent detainee from sleeping." *See* Interrogation Log, Detainee 063, *available at* http://www.time.com/time/2006/log/log.pdf.   The Deputy Assistant Director of the FBI complained to the Pentagon about this treatment after finding this prisoner in his cell "evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)."  Letter from T.J. Harrington, Dep'y Assist. Dir., FBI Counterterrorism Div., to Maj. Gen. Donald J. Ryder, U.S. Army (July 14, 2004).

[12]    M. Gregg Bloche & Jonathan H. Marks, *When Doctors Go to War*, New Eng. J. Med., Jan. 6, 2005, at 3. According to the British medical journal *The Lancet*, "medical records [have been] routinely shared with interrogators in clear breach of confidentiality and with the knowledge that such information can be misused[,] despite objections by the medical team of the International Committee of the Red Cross." Editorial, *How Complicit are Doctors in Abuses of Detainees?*, The Lancet, Aug. 21, 2004, at 637; *see also* Jane Mayer, *The Experiment*, New Yorker, July 11 & 18, 2005, *available at* http://www.cageprisoners.com/downloads/Mayer.pdf. The American Medical Association ("AMA") and American Psychiatric Association ("APA") have now adopted ethical guidelines that limit participation in interrogation. *See* AMA, *New AMA Ethical Policy Opposes Direct Physician Participation in Interrogation*, June 12, 2006, *available at* http://www.ama-assn.org/ama/pub/category/16446.html; APA, *APA Statement on Psychiatric Practices at Guantanamo Bay*, June 27, 2005, *available at* http://www.psych.org/news_room/ press_releases/05-40psychpracticeguantanamo.pdf.

[13]    Denbeaux, *supra* note 9, at 6.

[14]    *Id.*

"manipulative self-injurious behavior," rather than as suicide attempts.[15]  In 2004, also according to government data, prisoners committed another 110 acts of such "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings.[16] Even with its penchant for sanitizing suicides as "manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have attempted suicide a total of 41 times.

Once *habeas* counsel started meeting with their clients and began to recognize the depressive symptoms they had developed, counsel repeatedly ask to be allowed to send outside doctors to the prison to perform independent medical examinations of their clients. All such requests, including requests for the release of their clients' medical records, were refused.

The results were foreseeable. Last fall, counsel for Jumah al-Dossari found his client hanging from the wire meshing of an interview cell, his wrist slashed and a pool of blood gathering underneath. Previously, Mr. al-Dossari's counsel had sought an injunction requiring, among other things, access to his client's medical records. The government opposed this motion, claiming that the "the Guantánamo medical staff provide appropriate medical and mental health services to all prisoners through a thorough, coordinated team approach, based on individualized treatment plans that account for each patient's conditions and circumstances."[17]

On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded. However, in a statement released the following day, Admiral Harris stated that only two of these efforts were counted as "suicide attempts," apparently because only

---

[15]    *Id.* at 14.

[16]    *See id.* at 6.

[17]    Gov. Opp'n to Mot. for TRO & Prelim. Injunction, *Almurbati v. Bush*, No. 04-1227 (RBW) (filed Nov. 16, 2005) at 10.

two prisoners lost consciousness due to their attempts.[18]  Two other prisoners complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills. These prisoners received a medical and psychiatric evaluation, but Admiral Harris called these prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[19]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred. In light of the history, purpose, and nature of Guantánamo, the government's assertion that the deaths were acts of belligerence falls flat. It is far more likely that they were acts of hopelessness, desperation, and despair.

## II.    THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONER'S LEGAL PAPERS WAS UNLAWFUL.

This Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel. The Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-client communications. The Court should not ratify the government's violations of the Court's orders by permitting it to review further the privileged communications that it has seized.

### A.    Petitioner's Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause.

The attorney-client privilege is "the oldest of the privileges for confidential

---

[18]    Kathleen T. Rehm, *Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures*, May 19, 2006, *available at* http://www.defenselink.mil/news/May2006/20060519_5177.html.

[19]    Dep't of Defense, *Statement on Suicide Attempts at Guantanamo*, May 19, 2006, *available at* http://www.southcom.mil/PA/Media/Releases/Media%20Advisory%20-%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%    20-%201%20-%20Press%20briefing.pdf.

communications known to the common law."[20]  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[21]  As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[22]

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[23]  For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[24]  Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[25]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts. "The taking of

---

[20]    *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[21]    *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[22]    *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

[23]    *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[24]    *Bach*, 504 F.2d at 1102.

[25]    *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[26]

The government's vague assertions about notes found in the cell of a dead prisoner but written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* prisoners. Seizing legal papers not only interferes with a prisoner's access to courts but chills the giving, receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the prisoners' attorneys or the court.

As the Court ruled in *Al-Odah*, the prisoners – who have not been charged or tried, and who seek the opportunity through their counsel to challenge the basis of their detention – have a right to counsel and are entitled to a confidential relationship with their counsel.[27]  Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[28]  To give meaning to the attorney-client privilege in this context, this Court has implemented Access Procedures that guaranteed confidential

---

[26]  *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Wright v. Newsome*, 795 F.2d 964, 968  (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts."); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts).

[27]  *Al Odah*, 346 F. Supp. 2d at 5.

[28]  *Id.*

communication between prisoners and their attorneys through rules for in-person meetings and written communications.

The government's actions here violated the Protective Order and accompanying Access Procedures. The government does not attempt to justify its actions under the Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[29]  The government's unilateral decision to abrogate the privilege would have been unlawful even if it had not directly violated a Court order. Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – *i.e.*, that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[30]  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[31]

---

[29]    Resps.' Mot. at 9.

[30]    *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[31]    *See, e.g., United States v. Stewart*, No. CR 396 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The government has not cited any cases suggesting that the privilege may be invaded *without* an individualized, rigorous showing that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[32]  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that . . . *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[33]

**B.    The Government Has Made No Required Individualized Showing.**

The government has presented no individualized evidence that Petitioner has misused his legal papers. Four or five documents seized from a few selected prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners. What the government seeks here is permission for a fishing expedition.

The documents described by the government as evidence of "wrongdoing," moreover, offer no support for the government's position that attorney-client materials are being misused – let alone specific evidence that Petitioner has misused such materials. The documents were found either in the possession of one of the dead prisoners or were written by one of the deceased. And the additional documents, as described by the government, are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

---

[32]    *See, e.g.*, *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); *United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

[33]    *United States* v. *Zolin*, 491 U.S. 554, 572 (1989) (quotations and citation omitted).

First, the document labeled "FOUO" is a red herring. "FOUO" or "For Official Use Only" stamps are *not* classification designations and are not recognized by the Protective Order. "FOUO" is simply an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."[34]  The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[35] and in fact "is, by definition, unclassified."[36]  The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner may not legitimately be in possession of such documents.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators. (The government, of course, has failed to provide counsel with copies of the documents it relies upon for the instant motion, so counsel can only make an educated guess about the nature of the formerly "SECRET" document.)  Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly. It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it. The Protective Order does

---

[34]    DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[35]    *Id.* 5400.7-R: C4.1.1.

[36]    *Id.* AP3.2.2.3.2.

not prevent prisoners at Guantánamo from possessing unclassified documents, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents. The government's intimation that the document may *really* be a classified document that habeas counsel smuggled out of the secure facility, doctored, and then sent to one of their clients is outrageous.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder. The document therefore appears to have no relevance to the instant motion, which seeks further review only of privileged items that have been confiscated by government agents.

Fourth, a supposed suicide note handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners. The piece of paper was assertedly discovered in the mesh of the cell of one of the dead prisoners, not secreted in the privilege folder of any of the prisoners. If the deceased were seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document, why did he place it where it would inevitably be discovered?  The answer, most probably, is that the prisoner in fact wanted the note to be discovered and that he drafted it on the only piece of paper readily available to him. In all likelihood, the only "abuse" of the privilege system was one prisoner's agreement to provide the deceased with a piece of paper from his privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that – from the government's description of it, anyway – likely should not have been in the possession of a prisoner. Remarkably, however, the document is an *email from JTF-Guantánamo itself* – a

document that obviously was not provided to a prisoner by counsel, since counsel do not have access to such documents. How did this document come into possession of a prisoner? Did an interrogator or guard provide it? The NCIS should be investigating Joint Task Force personnel, not ransacking the legal papers of every prisoner at Guantánamo.

The very idea that prisoners would communicate with one another in writing is at odds with counsel's perception that (1) the prisoners at Guantánamo, like prisoners everywhere, are able to share information among themselves by word of mouth accurately and efficiently, (2) the prisoners would be most unlikely to leave a written record of their communications; and (3) the prisoners have experienced the seizure of their legal papers often enough that they would not have thought such papers a means of communicating with one another undetected. Indeed, there is no indication that Petitioner even knew the prisoners who died or that they were in the same camp (Petitioner is in Camp V) and so capable of communicating with each other. Further, counsel can affirm, based on their meetings with Petitioner, that Petitioner, who only has a sixth grade education, has a very limited writing ability, and so it is highly unlikely that he would be able to pass written communications to other prisoners.

The government's generalized security concerns are of a type already rejected by the Court. The government, when it sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[37] The Court rejected the government's claims, finding them "thinly supported." As for the government's speculation that Petitioner's counsel are improperly sharing classified information with their clients, this Court long ago reminded the government that "the

---

[37]     *Al Odah*, 346 F. Supp. 2d at 4 n.4.

government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[38]

## III.    ANY FURTHER REVIEW OF PETITIONER'S LEGAL PAPERS SHOULD BE BY THE COURT OR A SPECIAL MASTER.

If the further review of Petitioner's legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate. As the government hints in its filing, *see* Resps.' Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[39]  Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[40]  Even when such teams have been authorized, "at least three [of the] courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[41]

Especially given the government's history of interfering with the attorney-client relationships at Guantánamo, as well as its professed desire to "exploit the 'intelligence value'"

---

[38]    *Al Odah*, 346 F. Supp. 2d at 14.

[39]    *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see*, *e.g.*, *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

[40]    *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[41]    *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

of monitored attorney-client communications,[42] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[43] Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[44] Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[45]

Concerns about the appearance of propriety are especially important here, given the difficulties that counsel have experienced in gaining and keeping the prisoners' trust. Before meeting with counsel in the aftermath of *Rasul v. Bush*, 542 U.S. 466 (2004), the prisoners had "been detained virtually incommunicado for nearly three years without being charged with any crime."[46] Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system."[47] Worse, as a result of statements from interrogators and other government personnel, many prisoners suspect that their civilian attorneys are simply guards or interrogators in disguise.[48] These suspicions will only intensify when the prisoners learn that their attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

Another unacceptable aspect of the government's proposal is its suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine

---

[42]    *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[43]    *Stewart*, 2002 WL 1300059, at *6.

[44]    *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

[45]    *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[46]    *Al Odah*, 346 F. Supp. 2d at 12.

[47]    *Id.*

[48]    *See, e.g.*, Charlie Savage, *Guantánamo Detainees Find Fault with Lawyers*, Boston Globe, Aug. 10, 2005, at A1.

whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation.[49]  If the filter team determines that the documents are not privileged, the government proposes, then they will be "returned . . . to JTF-Guantánamo for appropriate action."[50]  It is not for a Filter Team to evaluate privilege claims. Such a review for privilege leaves "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege.[51]

The government's motion is also an apparent attempt to chill attorney-client communications. In its motion, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."[52]  This unfounded assertion is a veiled threat to habeas counsel, intended to deter them from communicating freely with their clients using their best professional judgment. Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[53]

*Habeas* counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions, those with access to the legal papers have security clearances, and they are all officers of the Court. It is not for the government to decide

---

[49]    *See* Resps.' Mot. at 11.

[50]    *Id.*

[51]    In re Grand Jury Subpoenas, slip op. at 10.

[52]    Resps.' Mot. at 10.

[53]    Resps.' Mot. 11 n.10.

what communications are "directly related" to habeas counsel's representation of their clients. And there is no warrant for a new team of Department of Defense lawyers to begin scouring the prisoners' legal papers to uncover evidence of suicide "plots."

## CONCLUSION

For all the reasons set forth above, Petitioner respectfully submits that Respondents' motion should be denied and Petitioner's motion should be granted.

Respectfully submitted,

GARVEY SCHUBERT BARER

By /s/ Robert C. Weaver, Jr.
Robert C. Weaver, Jr. OSB #80135
Samuel C. Kauffman, OSB #94352
GARVEY SCHUBERT BARER
Eleventh Floor
121 SW Morrison St.
Portland, OR 97204
Tel: (503) 228-3939
Fax: (503) 226-0259


By /s/ Eldon V.C. Greenberg
Eldon V.C. Greenberg
D.C. Bar #159558
GARVEY SCHUBERT BARER
Fifth Floor
1000 Potomac Street, N.W.
Washington, DC 20007
Tel: (202) 965-7880
Fax: (202) 965-1729

Attorneys for Petitioner


Dated: July 21, 2006